# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SWAN ENERGY, INC., BRANDON DAVIS, JOHN SCHIFFNER, and CODY DAVIS | § § § § | No. 331, 2025 |
| Plaintiffs Below, Appellants, | § § § | Court Below: Superior Court of the State of Delaware |
| v. | § § § | C.A. No. N24C-03-071 |
| INVESTOR PROTECTION UNIT OF THE DELAWARE DEPARTMENT OF JUSTICE, | § § § § § | |
| Defendant Below, Appellee. | § § § | |

Submitted: April 22, 2026
Decided: July 16, 2026

Before **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices.

Upon appeal from the Superior Court. **AFFIRMED**.

Travis J. Ferguson, Esquire, MCCARTER & ENGLISH, LLP, Wilmington, Delaware, Dean A. Elwell, Esquire, (*argued*), MCCARTER & ENGLISH, LLP, Boston, Massachusetts, *for Plaintiffs Below, Appellants*.

Ian R. Liston, Esquire, (*argued*), Lindsay Nasshorn, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware, *for Defendant Below, Appellee*.

**TRAYNOR**, Justice:

The Investor Protection Unit of the Delaware Department of Justice brought an administrative enforcement action against a corporation and four individuals, charging them with securities fraud and the unlawful sale of unregistered securities. After some procedural wrangling, four of the five respondents in the administrative action became the plaintiffs in this declaratory judgment action. They asked the Superior Court to declare that the administrative action and the statute under which it was brought violated their right to trial by jury as guaranteed by Article I, Section 4 of the Delaware Constitution. The plaintiffs also asked the court to declare that the process employed by the Investor Protection Unit and—in particular, the unit's "refusal to provide [them] access to past decisions"[1]—was violative of their due process rights under Sections 7, 8, and 9 of Article I of the Delaware Constitution.

The Superior Court dismissed the plaintiffs' complaint, concluding that the plaintiffs did not have a right to trial by jury in the administrative proceeding and that their due-process claim was not ripe for adjudication.[2] In this opinion, we explain why the trial court's decision was correct.

---

[1] App. to Opening Br. at A26.

[2] *Swan Energy, Inc. v. Inv. Prot. Unit of the Delaware Dep't of Just.*, 341 A.3d 1036 (Del. Super. Ct. 2025).

2

Our analysis of the plaintiffs' claim that they are entitled to a trial by jury is driven by our recent decision in *Blue Beach Bungalows DE, LLC. v. State of Delaware*.[3] In that case, we held that when, as here, a litigant claims a jury-trial right in an action based on a statute that does not itself provide for the right, trial by jury is available only if the cause of action is "sufficiently analogous to a cause of action to which the right to a jury at common law historically attached."[4] As we will explain, the Investor Protection Unit's administrative action against the plaintiffs does not have a sufficient analog at common law.

Nor do we find merit in the plaintiffs' due-process challenge. The plaintiffs acknowledge that, to the extent they are challenging the operation of the statute under the particular circumstances of this case—that is, an as-applied challenge—it is unripe for adjudication. They therefore characterize their objection to the statute as a facial challenge; they say that the statute cannot function in accordance with constitutional strictures under any set of circumstances. Viewed as such, their due-process claim is ripe, or so the plaintiffs contend, and the Superior Court erred by holding otherwise.

---

[3] 351 A.3d 1007 (Del. 2025) [hereinafter *Blue Beach*].

[4] *Id*. at 1034.

As we read the record, the plaintiffs framed their due-process challenge in the Superior Court as an as-applied challenge, and the court correctly dismissed it as unripe. But even if we were to accept that the plaintiffs mounted a facial challenge, their failure to demonstrate that the statute is unconstitutional in all its applications warrants dismissal of that claim. Consequently, we affirm the Superior Court's judgment.

## I

## A

The Delaware Securities Act (the "Act"), which is found in Title 6 of the Delaware Code, was enacted in 1973.[5] The Act is a "Blue Sky Law" that "requires registration of securities offered or sold here, states that certain representations are unlawful, creates a registration procedure for broker-dealers and investment advisors, and provides for administration by the Attorney General or a designated Deputy."[6]

Section 73-201 of the Act provides, in pertinent part:

> It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:
>
> (1) To employ any device, scheme or artifice to defraud;

---

[5] 59 Del. Laws. ch. 208 (1973).

[6] *Singer v. Magnavox Co.*, 380 A.2d 969, 981 (Del. 1977), *overruled in part on other grounds by Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983).

(2)    To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

(3)    To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

Section 73-202 of the Act prohibits the offer or sale of any security in Delaware unless (1) it is registered under the Act, (2) the security or transaction is exempted under § 73-207 of the Act, or (3) it is a "federal covered security" for which a notice filing has been made under the provisions of § 73-208 of the Act.

In 1991, the General Assembly amended the Act to, among other things, state its purpose:

> The purpose of the Delaware Securities Act is to prevent the public from being victimized by unscrupulous or overreaching broker-dealers, investment advisers or agents in the context of selling securities or giving investment advice, as well as to remedy any harm caused by securities law violations. This prophylactic and remedial purpose shall be deemed of paramount importance in the interpretation of the provisions of this Act and particularly in any judicial review of sanctions or penalties imposed by the Securities Commission and of motions or requests by persons affected to stay such sanctions or penalties.[7]

Under the original version of the Act, the designated Deputy acted as Securities Commissioner and was the principal executive officer of a Division of

---

[7] 68 Del. Laws ch. 181, § 17(b) (1991) (previously codified at 6 *Del. C.* § 7301). In 2023, § 7301 was amended to reflect coverage of investment adviser representatives and the change of the former Securities Commissioner's title to Investment Protection Director. This section is now found at 6 *Del. C.* § 73–101(b).

5

Securities of the Department of Justice. The General Assembly revised this nomenclature in 2013.[8] Section 73-102 of the Act now provides:

> (b) This chapter shall be administered by the Attorney General who may designate a Deputy Attorney General to act as Investor Protection Director to be the principal executive officer of an Investor Protection Unit of the Department of Justice to act for the Attorney General administering this chapter. The Investor Protection Director shall have the qualifications of and his or her salary shall be fixed as that of a Deputy Attorney General.

## B

The Investor Protection Unit ("IPU") has the authority to prosecute administrative proceedings under the Act.[9] Section 73-601 of the Act provides that, in such proceedings, the Investor Protection Director ("Director") may issue orders providing for a host of remedies, including cease-and-desist orders, fines, assessment of costs, ordering restitution to investors, conditional or probationary registration orders, issuing censures or reprimands, and imposing special reporting requirements.[10] This list is not exhaustive as the Act explicitly confers upon the Director the authority to order "other remedies which the Director determines to be in the public interest."[11]

---

[8] 79 Del. Laws ch. 182 (2013).

[9] 6 *Del. C.* § 73-501.

[10] 6 *Del. C.* § 73-601(a).

[11] *Id.*

The Act and the IPU rules promulgated by the Director under § 73-102 (the "Rules") establish a detailed procedural framework to govern administrative proceedings under the Act. The following is a non-exhaustive description of that framework.

The Director may delegate her adjudicatory powers and authority to "an administrative hearing officer appointed by the Attorney General (or his or her designee)."[12] The person to whom such power and authority is delegated is referred to as a "Presiding Officer."[13] In the delegation process "[p]reference shall be given to Presiding Officers with experience practicing securities law, or those with an academic background in securities law."[14]

An administrative proceeding under the Act is commenced by the service and filing of a written complaint, which "shall specify in reasonable detail the conduct alleged to constitute the violative activity and the statutory provision, rule, order or other condition the respondent is alleged to be violating or to have violated."[15] A respondent is to file an answer in much the same manner as defendants do under our courts' civil rules of procedure.[16]

---

[12] 6 *Del. C.* § 73-102(c).

[13] 6 Del. Admin. C. § 225(a).

[14] *Id.*

[15] 6 Del. Admin. C. § 221.

[16] 6 Del. Admin. C. § 224.

After the IPU files a complaint, it may request a hearing and, with the filing of the respondent's answer, the respondent too may request a hearing. The Rules direct the Presiding Officer to issue a notice—absent extraordinary circumstances, four weeks in advance—stating the date, time, and place of the hearing. No later than 20 days before the hearing date, the IPU must submit to the respondent and the Presiding Officer copies of all documentary evidence and the names of the witnesses who the IPU intends to present in its case-in-chief at the hearing.[17] Under the Rules, all hearings, which are to be public,[18] are to be "conducted in a fair, impartial, expeditious and orderly manner."[19] Witnesses must testify under oath or affirmation.[20]

The Rules further direct the Presiding Officer to "receive relevant evidence" with leeway to "exclude all evidence that is irrelevant, immaterial or unduly repetitious."[21] In discharging this duty, the Presiding Officer may refer to and be guided by the Delaware Rules of Evidence. But "the Presiding Officer may admit

---

[17] 6 Del. Admin. C. § 243.

[18] 6 Del. Admin. C. § 241 ("All hearings, except hearings on ex parte applications for a summary order under the Act, shall be public unless otherwise ordered by the Presiding Officer on his or her own motion or the motion of a party. No hearing shall be nonpublic where all respondents request that the hearing be made public.").

[19] 6 Del. Admin. C. § 240.

[20] 6 Del. Admin. C. § 244.

[21] 6 Del. Admin. C. § 245.

any evidence that reasonable and prudent individuals would commonly accept in the conduct of their affairs, and give probative effect to that evidence. Evidence may not be excluded solely on the ground that it is hearsay."[22]

After the hearing, the Presiding Officer is required to issue a written decision—generally within 60 days of the hearing's conclusion or the filing of post-hearing submissions. The decision must include: a summary of the evidence, factual findings and the evidentiary bases therefor, conclusions of law, and the sanctions or relief ordered, if any.[23] Final orders are appealable to the Court of Chancery.[24]

## C

In November 2020, the IPU initiated an administrative proceeding against the plaintiffs by filing an administrative complaint.[25] In the operative version of the administrative complaint—the Second Amended Administrative Complaint filed in May 2023—the IPU alleged that the plaintiffs were "conducting a long-running scheme to induce investors, including investors in Delaware, to purchase risky, unregistered oil and gas and mining securities."[26] In furtherance of the scheme,

---

[22] 6 Del. Admin. C. § 247.

[23] 6 Del. Admin. C. § 251.

[24] 6 *Del. C.* § 73-502.

[25] Our factual discussion is based on the facts alleged in the plaintiffs' first amended complaint ("FAC").

[26] App. to Opening Br. at A35.

according to the administrative complaint, certain of the plaintiffs committed securities fraud in violation of § 73-201 and all the plaintiffs offered and sold unregistered securities in violation of § 73-202. The IPU's complaint comprised 71 counts, each of which exposed the named respondents to a fine "not to exceed $10,000."[27] The IPU asked the Director to "enter an order providing restitution plus interest . . . an assessment of costs, fines in such amount as she deems appropriate, an order to cease and desist the offer and sale of unregistered securities in Delaware and to Delaware investors, and such other relief as she determines to be in the public interest."[28] A procedural snarl in the proceedings before the Director ensued.

### D

To a large extent, our review of that phase of this matter is constrained by the limited record of the administrative proceedings provided to the Superior Court. But because the plaintiffs' due-process claim is grounded in their allegations of procedural unfairness, we recite next our understanding of the relevant procedural facts that preceded the plaintiffs' commencement of judicial proceedings, beginning with the plaintiffs' efforts to secure documents they believe were relevant to their constitutional arguments.

---

[27] 6 *Del. C.* § 73-601(b).

[28] App. to Opening Br. at A84.

10

In March 2021, the plaintiffs filed a Freedom of Information Act ("FOIA") request with the Department of Justice ("DOJ"). According to the complaint, the plaintiffs took this route because, under the Act, they lacked subpoena power in the IPU Action. The plaintiffs' First Amended Complaint ("FAC") in the Superior Court described the scope and defended the relevance of this FOIA request in the following terms:

> Plaintiffs . . . request[ed] public records regarding, *inter alia*, orders, decisions, and proposed decisions issued by the IPU. In particular, Plaintiffs requested, *inter alia*, information about how often a Presiding Officer resolved an administrative proceeding favorably to the IPU, how much money respondents were ordered to pay, and where those monetary payments went. These orders, decisions, and proposed decisions are matters of public record pursuant to 6 *Del. Admin. C.* § 206(a) and are necessary to meet the IPU's allegations against Plaintiffs, determine whether they are being treated disparately, and determine whether the IPU's Presiding Officer has the requisite impartiality.[29]

The plaintiffs alleged that "[t]he DOJ refused to comply with these aspects"[30] of the FOIA request.

The plaintiffs filed a second FOIA request, this one with the Delaware Office of Management and Budget, requesting "public records regarding, *inter alia*, monies received, expended, and awarded as a result of orders, decisions and proposed

---

[29] *Id.* at A16 (FAC ¶31).

[30] *Id.*

11

decisions issued by the IPU."[31] Like the DOJ, the Office of Management and Budget "refused to comply with these aspects"[32] of the plaintiffs' second FOIA request.

In the wake of their ill-fated FOIA request, the plaintiffs served more traditional requests for production on the IPU. The problem with this approach, the complaint points out, is that "[n]o statute, rule or regulation permits Plaintiffs to issue discovery requests . . . [and] [t]he only available discovery mechanism is a subpoena"[33] issued not by a respondent, but only by the IPU. Even so, the plaintiffs charged ahead, serving three requests for production on the IPU. The plaintiffs' first request for production sought, among other things, the documents identified in their first FOIA request quoted above. According to the FAC, this request was "intended to discover how the IPU and its Presiding Officers had previously resolved legal issues relevant to the IPU Action and to discover the fines, penalties, costs, and charges imposed on other similarly situated respondents."[34] The plaintiffs alleged that the IPU, which had "repeatedly represented to Plaintiffs that they 'are not entitled to discovery in this administrative proceeding,'"[35] refused to comply with the renewed FOIA requests, contending that they represented "burdensome,

---

[31] *Id*. (FAC ¶32).

[32] *Id*. at A17 (FAC ¶32).

[33] *Id*. (FAC ¶34).

[34] *Id*. (FAC ¶36).

[35] *Id*. (FAC ¶35).

disproportionate discovery to support a baseless constitutional challenge."[36]  The

IPU did, however, refer the plaintiffs to the IPU website, which contains, according

to the FAC, "only a fraction of the IPU's orders, decisions, and proposed

decisions[]," and most of those are "conclusory consent orders with no legal

analysis."[37]

The plaintiffs later served a second request for production on the IPU with

which the IPU "refused to comply."[38]  The FAC does not disclose the substance of

this request or the basis of the IPU's objections.  A third request for production and

a request to the Presiding Officer for the issuance of a subpoena duces tecum

followed but, according to the FAC, they "were never resolved."[39]  This wrangling

over information rights figures prominently in the plaintiffs' constitutional claims.

We turn next to how those claims were framed in the Superior Court.

E

The FAC's description of how the plaintiffs first raised the constitutional

issues that are now before us is murky.  For instance, the FAC alleged that the

plaintiffs "first raised constitutional issues with the IPU Action in their answers to

---

[36] *Id*. (FAC ¶36).

[37] *Id*. at A18 (FAC ¶37).

[38] *Id*. (FAC ¶38).

[39] *Id*. (FAC ¶39).

the IPU's Administrative Complaint."[40]  It does not describe the nature of those issues.  The FAC then lists several dates when the plaintiffs "raised constitutional issues"[41] and refers to the Presiding Officer's recognition that the plaintiffs were raising "constitutional issues"[42] and "broad constitutional defenses."[43]

Notably, the FAC does not allege that the plaintiffs asserted their right to trial by jury or a claim that the administrative action infringed on their due process rights before the summer of 2023—nearly three years after the IPU filed its first administrative complaint.  According to the FAC, in July 2023, "the Presiding Officer acknowledged the constitutional issues presented and set a deadline [of December 1, 2023] for Plaintiffs to move for summary disposition on them."[44]  But well before the deadline arrived, the Presiding Officer issued an order *sua sponte* providing that she would not consider any constitutional issues and that "any such issues must be raised (if at all) in the judicial forum on or before December 1, 2023."[45]

---

[40] *Id.* (FAC ¶40).

[41] *Id*. (FAC ¶42).

[42] *Id.* at A19 (FAC ¶45).

[43] *Id*.

[44] *Id*. (FAC ¶43). There is an unexplained gap from mid-2022 to June 2023 in the procedural history of the administrative proceedings as outlined in the FAC.  According to the IPU's opening brief in support of its motion to dismiss in the Superior Court, the proceedings were stayed for approximately one year while the parties engaged in settlement discussions.

[45] *Id*. (FAC ¶46).

14

In response, the plaintiffs filed a complaint in the Court of Chancery, requesting "(a) a declaration that the IPU Action and 6 *Del. C.* § 73-601 violate Plaintiffs' constitutional rights to trial by jury and due process and (b) an injunction enjoining the IPU Action from proceeding until Plaintiffs' declaratory judgment claims are fully and finally resolved, including any appeal to the Delaware Supreme Court."[46]

After the parties stipulated—and the Presiding Officer agreed—to a stay of the IPU Action, obviating the need for injunctive relief, the parties agreed to transfer the case to the Superior Court in accordance with 10 *Del. C.* § 1902.[47]

F

As alleged under Count I of the FAC, the plaintiffs' claim that they are entitled to a jury trial, which we discuss in detail later, is straightforward. The FAC alleges that, because, at common law, fraud and securities regulations claims were triable

---

[46] *Id*. at A20 (FAC ¶49). The complaint was filed on December 1, 2023, two days after the United States Supreme Court heard oral argument in *Sec. & Exch. Comm'n v. Jarkesy*, 603 U.S. 109 (2024). In *Jarkesy*, as we will discuss later, the Supreme Court held that when the SEC seeks penalties against a defendant for securities fraud, the Seventh Amendment to the United States Constitution entitles the defendant to a trial by jury. The timing of the plaintiffs' complaint in relation to *Jarkesy* is irrelevant to our analysis. We mention it merely as a possible explanation of the plaintiffs' apparent reluctance to describe the constitutional issues it had raised in the administrative proceedings. In this regard, in the IPU's opening brief below in support of its motion to dismiss, it asserts that the plaintiffs' answer to the IPU's administrative complaint did not raise the jury trial-right and due-process issues that are before us here.

[47] 10 *Del. C.* § 1902 permits the transfer of proceedings from a court lacking subject-matter jurisdiction to "an appropriate court."

15

by juries in courts of law, the IPU Action, in which no jury is available, violates their rights under Article I, § 4 of the Delaware Constitution. The plaintiffs' due-process claim, as alleged in Count II of the FAC, is more nuanced. As with the plaintiffs' trial-by-jury claim, we will delve deeper into their due-process claim later. For present purposes, it suffices to sketch its broad outlines.

Observing that the IPU sought to deprive them of their protected liberty and property interests, the plaintiffs alleged that their due-process rights under the Delaware Constitution were triggered by, then violated in, the IPU Action. The crux of the plaintiffs' due-process claim as alleged in the FAC was that their inability to secure the IPU's prior orders, decisions, and proposed orders implicated and violated their due-process rights in two ways. First, in the FAC's words "[w]ithout access to the IPU's record of past decisions, those who wish to assiduously comply with the Delaware Securities Act are forced to guess as to whether a given agreement, transaction, or course of action is proper or proscribed because they cannot know how the IPU has interpreted the Delaware Securities Act in the past."[48] This, by the plaintiffs' lights, impermissibly impaired the plaintiffs' due-process rights to notice and an opportunity to be heard.

---

[48] App. to Opening Br. at A27 (FAC ¶72).

16

Second, the FAC alleged that the IPU's purported refusal to make its decisions publicly available made it impossible for the plaintiffs or the Superior Court to determine whether the Presiding Officer has "the requisite impartiality"[49] that due process demands. Visibility into the Presiding Officer's impartiality, the plaintiffs alleged, is particularly important in this context given (i) that "the Presiding Officer and the prosecutors are all Deputy Attorneys General reporting to the same Attorney General" and (ii) that how the IPU is funded gives rise to a suspicion that the Presiding Officer might have a pecuniary interest in the IPU Action's outcome.

Both due-process concerns—(i) notice and opportunity to be heard and (ii) inability to assess impartiality—were woven tightly with the plaintiffs' alleged lack of access to the IPU's prior decisions and orders and its funding mechanisms.

G

The IPU moved to dismiss the FAC, contending that the FAC failed to state a claim upon which relief could be granted. It argued that the plaintiffs waived any purported right to a jury trial but that, in any event, the right to trial by jury did not attach to a securities-fraud claim under the Act. The IPU sought dismissal of the plaintiffs' due-process claim on both procedural and substantive grounds. More specifically, the IPU argued that the due-process claim was unripe but that, even if

---

[49] *Id*. at A28 (FAC ¶74).

it were ripe, the administrative procedures under the Act provide due process and the plaintiffs had not pleaded facts that demonstrated otherwise.

In their opposition, the plaintiffs, though acknowledging that Article I, § 4 of the Delaware Constitution—and not the Seventh Amendment—governed their jury-trial claim, urged the court to hew to the United States Supreme Court's recent decision in *Securities and Exchange Commission v. Jarkesy*[50] and recognize that they had a right to a jury trial in the IPU Action. In response to the IPU's motion to dismiss their due-process claim, the plaintiffs maintained their position that their frustrated efforts to gain "access to the IPU's precedent"[51] and information about IPU's funding via monies received as a result of its orders and decisions rendered the process by which the IPU Action was being prosecuted constitutionally deficient.

As we will discuss more fully later on, the Superior Court rejected the plaintiffs arguments, dismissing the FAC and its requests for declaratory relief. The plaintiffs appealed.

On appeal, the plaintiffs press more or less the same arguments they made below. First, they contend that Article I, § 4 of the Delaware Constitution guarantees their right to a jury trial in the IPU's enforcement action for securities fraud and

---

[50] 603 U.S. 109 (2024).

[51] App. to Opening Br. at A395.

18

registration violations in which the IPU seeks to impose monetary penalties. Because § 73-605, which authorizes the Director to order monetary penalties, does not provide for the jury trials, it is, according to the plaintiffs, unconstitutional. Second, the plaintiffs maintain that the Superior Court erred when it ruled that their due-process challenge was not ripe.

## II

Questions of law, including claims challenging the constitutionality of statutes, are reviewed *de novo*.[52] We start, however, with the presumption that statutes enacted by the Delaware General Assembly are constitutional.[53] A party who asks us to invalidate a statute bears the burden of rebutting this presumption by clear and convincing evidence.[54] And our assessment of whether this burden has been carried should be tempered by "deference to legislative judgment in matters 'fairly debatable.'"[55]

---

[52] *Doe v. Wilmington Hous. Auth.*, 88 A.3d 654, 661 (Del. 2014).

[53] *Hoover v. State*, 958 A.2d 816, 821 (Del. 2008).

[54] *Albence v. Higgin*, 295 A.3d 1065, 1088 (Del. 2022); *Sierra v. Dep't of Servs. for Child., Youth & their Fams.*, 238 A.3d 142, 155–56 (Del. 2020).

[55] *Helman v. State*, 784 A.2d 1058, 1068 (Del. 2001) (quoting *Wilmington Med. Ctr., Inc. v. Bradford*, 382 A.2d 1338, 1342 (Del. 1978)).

19

## III

The operative sentence of Article I, § 4 of the Delaware Constitution is concise: "Trial by jury shall be as heretofore." As Justice Holland observed in *Claudio v. State*,[56] "[t]his Court and the other courts of Delaware have always construed that provision in the Delaware Constitution as '*guaranteeing the right to trial by jury as it existed at common law*.'"[57]

We adhered to that construction in *Blue Beach*. There, we recognized a three-step framework for determining whether a cause of action created by statute that does not itself provide for a jury trial nevertheless triggers the right to a jury. The first step—actually assumed within the question to be answered—is determining whether the General Assembly provided for a right to trial by jury in the statute. If it did not, the second step is to determine "whether the new statutory cause of action is sufficiently analogous to a cause of action at common law."[58] If it is, then the third step determines whether, historically, the analogous cause of action was tried before a jury. If it was, the statutory cause of action carries with it a jury-trial right despite the General Assembly's silence.

---

[56] 585 A.2d 1278 (Del. 1991).

[57] *Id*. at 1297 (emphasis in original) (quoting *Fountain v. State*, 275 A.2d 251, 251(Del. 1971)).

[58] *Blue Beach*, 351 A.3d at 1035.

The plaintiffs do not contest the applicability of *Blue Beach*'s three-step framework for analyzing whether Article I, § 4 jury-trial rights attach to a statutory cause of action; instead, they contend that the Superior Court's analysis is inconsistent with it. We disagree. Although we had not yet issued our decision in *Blue Beach* when the Superior Court decided this case, we are satisfied that the court's decision touches upon the two relevant steps in the *Blue Beach* test.

The court first observed that the General Assembly did not provide for jury trials in actions brought by the IPU under the Act. The court did not, as the plaintiffs appear to argue, conclude its analysis there.[59] The court also considered whether IPU enforcement actions for securities fraud and registration violations under the Act are sufficiently analogous to common law causes of action; the court concluded that they were not.[60] We address next why we agree with this conclusion, beginning with a comparison of securities fraud under the Act and common law fraud.

A

The Superior Court's conclusion that securities fraud under the Act was insufficiently analogous to common law fraud was grounded in the disparity between

---

[59] Appellant's Suppl. Br. at 8 ("The Superior Court reasoned that Appellants are not entitled to trial by jury because the General Assembly did not intend to provide a jury trial in securities fraud and regulation cases . . . . *Blue Beach* rejected the Superior Court's approach. Whether the General Assembly provided a statutory right to trial by jury is just step one of the analysis.").

[60] This obviates the need to address *Blue Beach*'s third step.

21

the pleading standards applicable to the two causes of action. Understanding the source of this disparity will be aided by a brief historical digression.

The elements of fraud at common law are:

1) a false representation, usually one of fact, made by the defendant;
2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth;
3) an intent to induce the plaintiff to act or to refrain from acting;
4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and
5) damage to the plaintiff as a result of such reliance.[61]

In 1993, in *Hubbard v. Hibbard Brown & Co.*,[62] this Court held that, in order to establish securities fraud under the Act,

> [i]t must be demonstrated that the defendant (1) made a misstatement or omission (2) of material fact (3) with scienter (4) in connection with a purchase or sale of a security (5) upon which the plaintiff (or another person if the action is brought by the Delaware Securities Division) relied and (6) that reliance proximately caused the plaintiff's (or other person's) injury.[63]

The Court supported this enumeration by citing an opinion of the Third Circuit Court of Appeals that concerned a stockholder class action—that is, a private cause of action—alleging Rule 10b-5 violations and not a government enforcement action.

It must be conceded that the securities-fraud elements enumerated in *Hubbard* are closely aligned with the common-law fraud elements as we set them forth above.

---

[61] *Stephenson v. Capano Development Co.*, 462 A.2d 1069, 1074 (Del. 1983).

[62] 633 A.2d 345 (Del. 1993).

[63] *Id.* at 349.

In the 2013 amendments to the Act, however, the General Assembly added the following language to § 73-201:

> In interpreting this Section, courts will be guided by the interpretations given by the Federal Courts to similar language set forth in Section 17(a) of the Securities Act of 1933 and Rule 10b-5 promulgated under the Securities Exchange Act of 1934, to include, without limitation, *any difference in pleading requirements governing actions brought by securities regulators as opposed to private litigants*.[64]

The IPU argued below, and the court agreed, that this provision "partially superseded" *Hubbard* and directs our courts to be guided by federal caselaw when identifying the requisite elements of securities fraud under the Act. Here, the Superior Court did just that and determined that, because the IPU brought fraud claims under §§ 73-201(2) and (3)—provisions based on §§ 17(a)(2) and (3) of the Securities Act of 1933—the IPU is not required to prove scienter.[65] The court further held that, in its enforcement actions, the IPU need not prove reliance, as federal courts have excused the SEC from establishing reliance, loss causation, and damages in civil enforcement actions.[66] The court also noted that causes of action for common-law fraud and enforcement actions for securities fraud serve different purposes, the former providing a remedy for an individual's injuries and the latter

---

[64] 79 Del. Laws ch. 182, § 4 (2013) (emphasis added) (amending § 73-201 of the Delaware Code).

[65] *Swan Energy*, 341 A.3d at 1053; *see Aaron v. SEC*, 446 U.S. 680, 701-02 (1980).

[66] *Swan Energy*, 341 A.3d at 1053; *see SEC v. Goble*, 682 F.3d 934, 943 (11th Cir. 2012).

protecting the public. The court then concluded that, "[i]n light of the differences in the elements and purposes of common law fraud and securities fraud, plaintiffs have not shown, by clear and convincing evidence, that the right to a trial by jury applies to securities fraud actions brought by the government under the Delaware Securities Act."[67]

In this appeal, the plaintiffs do not contest the Superior Court's conclusion that the IPU need not prove reliance or scienter in civil enforcement actions under § 73-201. Instead, they enlist the 2013 amendment's instruction that we be guided by the federal courts' interpretations of analogous federal statutes in service of their argument that we are bound to adopt the United States Supreme Court's rationale in *Jarkesy*.[68]

As mentioned earlier, in *Jarkesy*, the Supreme Court held that the Seventh Amendment to the United States Constitution entitles a defendant to a jury trial when the SEC seeks civil penalties for securities fraud.[69] Of course, as we pointed out in *Blue Beach*, *Jarkesy* was grounded in the Seventh Amendment, which has not been incorporated and applied to the states by the Fourteenth Amendment.[70] As such, it

---

[67] *Swan Energy*, 341 A.3d at 1054.

[68] 603 U.S. 109 (2024).

[69] *Id*. at 120.

[70] *Blue Beach*, 351 A.3d at 1038.

is not binding on us, and the plaintiffs concede as much here. Rather than insist that we follow *Jarkesy*'s Seventh Amendment analysis, the plaintiffs urge us to adopt—and, indeed, suggest that the 2013 amendments require us to adopt—the Supreme Court's view concerning the similarity of fraud under federal securities law and the common law. Specifically, the plaintiffs point to the *Jarkesy* majority's description of the "close relationship" between causes of action for fraud under federal securities laws and common-law fraud and the "enduring link" between the two.[71]

We are not persuaded that these statements undermine the trial court's conclusion that securities fraud is not so analogous to common-law fraud as to require a jury trial under the Delaware Constitution. In the first place, the 2013 amendment instructs our courts to be guided by the federal courts' "interpretations" of the anti-fraud provisions in federal securities laws. We do not view the Supreme Court's review of the relationship of the federal securities laws to common-law fraud as interpreting, as in ascertaining the meaning of, those laws. More than that, the Court's comparative exercise in *Jarkesy* was focused on determining whether the enforcement action at issue was "legal in nature," an inquiry that, as we explained in *Blue Beach*, is inapposite to our state constitutional analysis.[72]

---

[71] *Id.* at 125.

[72] *Id.* at 126.

The plaintiffs also fault the Superior Court for taking insufficient heed of the remedies available for the common-law antecedent of the Act. They contend that, the availability of a legal remedy—damages—in common law fraud actions weighs in favor of their claim that enforcement actions under the Act are triable before a jury. In support of this argument, the plaintiffs quote our observation in *Blue Beach* that "an inquiry into law or equity may be helpful in determining whether a matter receives a jury trial."[73]

A closer examination of *Blue Beach* and, in particular, the text that follows the passage quoted above exposes the flaw in the plaintiffs' argument. In full, we clarified:

> To be clear, we do not reject the notion that an inquiry into law or equity may be helpful in determining whether a matter receives a jury trial. Indeed, if the only analogy that can sufficiently be drawn is to . . . a historically equitable cause of action (as suggested by *Cahill*) then it is likely that the new statutory cause of action will not receive a jury trial. *But determining that an analogous historical cause of action was at equity and therefore did not receive a jury trial is more consistent with step three of the analysis we outline above. This does not change the fact that one must find a sufficient analogy in the first place.* Therefore, it is clear to us that when evaluating jury-related constitutional claims, Delaware courts do not focus solely on the claim's legal or equitable nature.[74]

---

[73] Appellants' Suppl. Br. at 17 (quoting *Blue Beach*, 351 A.3d at 1037).

[74] *Blue Beach*, 351 A.3d at 1037.

Here, for the reasons given by the trial court with which we agree, the plaintiffs failed in their effort to provide a sufficiently analogous cause of action at common law that was triable before a jury.[75] They failed at step two, taking step three off the board. In sum, a jury trial is not available in IPU enforcement actions for securities fraud under the Act.

B

The plaintiffs contended in the Superior Court, as they do here, that because English statutes in the 17th and 18th centuries imposed registration and licensure requirements similar to those found in § 73-202, under which violations were punishable by civil penalties and triable by juries, Article I, § 4 commands that a jury be available for § 73-202 violations. For the plaintiffs, Article I, § 4's guarantee of jury-trial rights "as heretofore"—that is "as it existed at common law"—attaches to actions commenced under English statutes, extant at the founding, that conferred a

_____

[75] This conclusion finds support in a pre-*Jarkesy* decision of the New Hampshire Supreme Court. *See Ridlon v. New Hampshire Bureau of Sec. Reg.*, 214 A.3d 1196, 1204 (N.H. 2019) ("[An] administrative proceeding . . . under the Securities Act is not analogous to common law fraud or deceit because it requires proof of significantly different elements and satisfaction of a different standard of proof.") (quotation marks and brackets omitted).

27

right to a jury trial. The Superior Court rejected this expansive definition of the common law, and we agree.

In reaching this conclusion, we see no need to depart from the Superior Court's analysis. That the drafters of Delaware's first constitution in 1776 recognized a distinction between common law and the pre-existing statutory law of England is evidenced by Article 25 of the 1776 Constitution. There, our forebears ensured that "[t]he common law of England, *as well as so much of the statute law as have been heretofore adopted in practice in this state*, shall remain in force, unless they shall be altered by a future law of the Legislature[.]"[76] And, as the Superior Court noted, that distinction between statutory and common law still prevails. Indeed, Black's Law Dictionary's first entry for "common law" is "[t]he body of law derived from judicial decisions, rather than from statutes or constitutions."[77]

Reasonable minds might differ as to whether these distinctions and definitions fit seamlessly into our interpretation of Article I, § 4. It is well to keep in mind, however, that we presume the Act to be constitutional and that the plaintiffs bear the

---

[76] Del. Const. art. 25 (1776) (emphasis added).

[77] Common law, *Black's Law Dictionary* 345 (11th ed. 2019).

28

burden of rebutting that presumption by clear and convincing evidence; they have not done that here.

C

The plaintiffs contend that, because the IPU seeks civil penalties, they are entitled to trial by jury under Article I, § 4. In so arguing, the plaintiffs rely on *Jarkesy* and a host of cases whose concern is whether a particular cause of action is legal or equitable. This argument did not survive our opinion in *Blue Beach*, in which we held, as touched upon previously, that "the measure of a jury trial for Delaware is the common law, not the remedy sought."[78]

To summarize, the plaintiffs have not identified a common-law action triable before a jury that is sufficiently analogous to the IPU's allegations of securities fraud or its charging of registration violations. Nor does the IPU's pursuit of civil penalties trigger a right to trial by jury.[79] We therefore affirm the Superior Court's dismissal of Count I of the FAC. Whether the Superior Court erred when it dismissed Count II of the FAC—the plaintiffs' due-process claim—is the question to which we now turn.

---

[78] *Blue Beach*, 351 A.2d at 1039 (emphasis omitted). In fairness to the plaintiffs, we note that the plaintiffs' argument on this point in both their opening and reply briefs were advanced before we issued our opinion in *Blue Beach*.

[79] *Id*. at 1045.

IV

A

It is undisputed that Sections 7 and 9 of Article I of the Delaware Constitution require that "[b]efore a party can be deprived of life, liberty, or property, it has the right to notice and a hearing in a meaningful time and meaningful manner."[80] And this Court has recognized that "in the exercise of quasi-judicial or adjudicatory administrative power, administrative hearings, like judicial proceedings, are governed by fundamental requirements of fairness which are the essence of due process . . . ."[81] And this, we point out, means that "[a]t a minimum, such proceedings require adequate notice to all concerned; a full opportunity to be heard by any person potentially aggrieved by the outcome; a decision which reflects the reasons underlying the result and, most importantly, an adherence to the statutory or decisional standards then controlling."[82]

Because the plaintiffs had not yet suffered any deprivation of their property or liberty as the result of the purportedly unfair administrative process, their claim, the Superior Court concluded, was unripe for adjudication. In so finding, it is clear that

---

[80] *Formosa Plastics Corp. v. Wilson*, 504 A.2d 1083, 1089 (Del. 1986) (citing *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972)).

[81] *Vincent v. E. Shore Markets*, 970 A.2d 160, 163–64 (Del. 2009) (quoting *Phillips v. Delhaize America, Inc.*, 2007 WL 2122139, at *2 (Del. Super. Ct. July 20, 2007)).

[82] *Cnty. Council of Sussex Cnty. v. Green*, 516 A.2d 480, 481 (Del. 1986)).

30

the court viewed the plaintiffs' due-process claim as an as-applied challenge. Conceding now that, if their claim is considered to be an as-applied challenge,[83] it is not ripe, the plaintiffs insist that they are—and always have been—mounting a facial challenge, a claim that is not subject to ripeness concerns. We disagree with the plaintiffs' characterization of their challenge as facial but, in the end, it does not matter. Even if we were to agree with the plaintiffs, their putatively facial challenge would fail.

To support our analysis of whether the plaintiffs' due-process claim is a facial challenge or an as-applied challenge, we draw upon the difference between the two that we observed in *Delaware Board of Medical Licensure and Discipline v. Grossinger*.[84] In that case, we noted that "[a] facial challenge alleges that a statute or regulation is not [constitutionally] valid under any set of circumstances; an as-applied challenge alleges that a statute or regulation is not valid in the particular

---

[83] Oral Argument at 16:08-16:42, *Swan Energy, Inc. v. Inv. Prot. Unit of the Delaware Dep't of Just.* (No. 331, 2025), https://vimeo.com/1185541206?fl=pl&fe=vl. We reproduce the relevant exchange here:

> The Court: Would you agree that if we could isolate the as-applied challenge, that aspect is unripe?
>
> Plaintiffs' counsel: If this were an as-applied challenge, I believe that's correct. As a facial challenge, which this has always been—that's the only reasonable reading of our complaint at paragraphs 61 to 78. As a facial challenge, its ripe now because having to endure the in-house process is our injury under *Axon*, as the Superior Court correctly recognized.

*Id.*

[84] 224 A.3d 939 (Del. 2020).

31

circumstances of the case."[85] A review of the FAC and counsel's argument in the Superior Court persuades us that the plaintiffs' due-process challenge fits more comfortably within the latter definition than in the former.

The gravamen of the plaintiffs' due-process claim is that they were denied access to documents and information, most notably prior decisions of the IPU. Emblematic of this theme are the following allegations.

> [T]he IPU either improperly fails to make its orders, decisions, and proposed decisions accessible to the public or it mischaracterizes them and withholds them as nonpublic. Either way, *the IPU has wrongfully deprived Plaintiffs of their rights to inspect the IPU's orders, decisions, and proposed decisions*.[86]

> [W]hen Plaintiffs attempted to access the orders, decisions, and proposed decisions of Presiding Officers through FOIA Requests and three written discovery requests, the IPU rebuffed their attempts.[87]

> *[T]he IPU's refusal to make its decisions publicly available*—while simultaneously representing to Plaintiffs through 6 *Del. Admin. C.* § 206, its public website, and statements in the IPU Action that such decisions are readily available—*prevents Plaintiffs and this Court from determining whether the Presiding Officer* (who is saddled with a dual prosecutor-judge role, appointed by the Director, and whose delegated powers may be unilaterally revoked by the Director) *has the requisite impartiality*.[88]

> [W]ithout access to the IPU's precedent, neither Plaintiffs nor this Court can assess the IPU's success rate in administrative proceedings, even

---

[85] *Id*. at 956 (*citing U.S. v. Salerno*, 481 U.S. 739, 745 (1987)).

[86] App. to Opening Br. at A25–26 (FAC ¶68) (emphasis added).

[87] *Id*. at A26 (FAC ¶70).

[88] *Id*. at A28 (FAC ¶74) (emphasis added).

though a perfect or abnormally high success rate would be powerful specific evidence of bias, whether on the part of a particular Presiding Officer or as an inevitable consequence of the IPU's structure.[89]

A thread running through these statements is the notion that, if only the plaintiffs could secure the documents and information they sought in their FOIA requests and requests for production, they could make the case that the Presiding Officer in this case was not impartial. If there was any question about this, the plaintiffs' counsel answered it at oral argument in the Superior Court. On that occasion, the plaintiffs' counsel addressed the "strong presumption" of impartiality this Court recognized in *Blinder, Robinson & Co., Inc. v. Bruton*,[90] a case that involved a due-process challenge to an administrative proceeding under the Act, predicated on the Commissioner's (now denominated "Director") commingling of the roles of prosecutor and adjudicator. In disposing of the challenge, this Court held that, in the absence of specific evidence of bias, "[t]he mere prosecution of a case by one Deputy Attorney General before another Deputy Attorney General, acting in an adjudicatory capacity, is not sufficient to overcome the strong presumption [of honesty and integrity]"[91] that the United States Supreme Court recognized under

---

[89] *Id*. at A29–30 (FAC ¶75).

[90] 552 A.2d 466 (Del. 1989).

[91] *Id.* at 473.

33

similar circumstances in *Withrow v. Larkin*.[92]  Here, the plaintiffs' counsel argued to the Superior Court:

> [T]here's a question about the role the discovery plays here, and particularly with regard to the due process challenge. . . .  We're not running from *Blinder*.
>
> What *Blinder* creates . . . is a very strong presumption of the legitimacy of a proceeding that's operating under the aegis of the Attorney General, being presided over by a hearing officer, who is a Deputy Attorney General, and being prosecuted by another Deputy Attorney General. *But Blinder never says that is an irrebuttable presumption. We have to overcome a very strong presumption against bias.*
>
> The only way that can ever happen in civil litigation is through discovery.[93]

Reading this argument together with the FAC's allegations, we conclude that the Superior Court was justified in viewing the plaintiffs' due-process challenge as an as-applied challenge.  The plaintiffs' embrace of *Blinder*, coupled with their insistence that their limited information rights *in this case* hindered their ability to challenge the Presiding Officer's impartiality, strongly suggests that the plaintiffs did not intend to challenge the IPU process in all its applications.  And, as mentioned, the plaintiffs have conceded that, to the extent that their challenge is an as-applied challenge, it is unripe.

---

[92] 421 U.S. 35, 47 (1975).

[93] App. to Ans. Br. at B91 (emphasis added).

B

The plaintiffs due-process claim fares no better if it is treated as a facial challenge. As previously discussed, at the heart of the plaintiffs' due-process claim is their concern that, because the presiding officer in IPU administrative enforcement actions is a Deputy Attorney General dependent on the Attorney General for compensation, assignments, and career advancement, the presiding officer's impartiality is compromised. To advance a facial challenge, this inherent partiality must exist in all cases. But the plaintiffs' underlying supposition collides with our decision in *Blinder*, discussed briefly above, which recognized a strong presumption that Deputy Attorneys General charged with adjudicating administrative enforcement actions do so with honesty and integrity.

As we understand it, the plaintiffs' work-around for *Blinder* is to claim that their inability to gain access to every single prior ruling in IPU administrative proceedings impairs their ability to rebut *Blinder*'s presumption.[94] If they could secure the prior rulings, they could assess—or so they assert—"whether the IPU's prosecutorial success rate is unconstitutionally entangled with its funding

---

[94] See Opening Br. at 36 ("In the absence of discovery and accessible reasoning, review for adjudicative neutrality and consistency is unfairly thwarted."); *see also id*. at 42. ("Without access to these rulings, neither Appellants nor a reviewing court can assess the IPU's in-house success rate, even though a perfect or abnormally high success rate would be powerful specific evidence of bias.").

structure."[95]  Quoting § 73-703(b)(2), the FAC observes that "any moneys paid . . .

in a securities action brought by the Attorney General or the Investor Protection

Director . . . shall be credited to the Investor Protection Fund."[96]  The FAC then notes

that, under § 73-703 (e), "[t]he Attorney General is authorized to expend from the

Investor Protection Fund such moneys as are necessary for the payment of costs,

expenses, and charges [incurred] in connection with the activities of the Investor

Protection Unit . . . ."[97]

Based in large part on these provisions, one of which is artfully edited,[98] the

FAC alleges that the Act creates a risk that the Presiding Officer will have a

pecuniary interest in the outcome of IPU proceedings, one that could avoid the

---

[95] App. to Opening Br. at A30 (FAC ¶76).

[96] *Id*. at A13–14 (FAC ¶22).

[97] *Id*. at A14 (FAC ¶22) (quoting 6 *Del. C.* § 73-703(e)).

[98] The plaintiffs' quotation elides the phrase "pursuant to a court order or judgment, including costs and attorney's fees . . ." drawn from §73-703(b)(2).  The plaintiffs also chose to omit the subsections of §73-703 that would appear to be more relevant, though unhelpful, to their argument. Section 73-703(c) provides that "[a]ny fines, costs or other moneys (except those obtained as restitution or recission) received by the Director as a result of an administrative order (other than a consent order) *shall be credited to the General Fund*." (emphasis added).  Section 73-703(d) provides that, "[i]f, at the end of any fiscal year, the balance in the Investor Protection Fund exceeds $750,000, the excess shall be withdrawn from the Investor Protection Fund and deposited in the General Fund."  Reading §73-703 in its entirety, we understand that moneys received as the result of a Presiding Officer's order are not credited to the Investor Protection Fund.

36

application of *Blinder*.  Count II of the FAC—the plaintiffs' due-process count—

reads, in part:

> Even Blinder recognized that there are "situations where experience teaches that there is too high a probability of bias on the part of a decision-maker to be constitutionally acceptable." *Id*. "That risk exists where the adjudicator 'has a pecuniary interest in the outcome . . . .'" *Id*. (quoting *Withrow*, 421 U.S. at 47). Precisely that concern is present here. Because all funds paid in an IPU administrative proceeding are credited to the Investor Protection Fund, and the Attorney General is authorized to spend those funds to pay for the operations of the IPU, Presiding Officers' decisions will have a material effect on the IPU's funding.[99]

But the plaintiffs do not allege that the IPUs funding structure is, on its face,

unconstitutional.  Instead, they point to their inability to secure "information about

the monies received, expended, and awarded as a result of orders, decisions and

proposed decisions issued by the IPU,"[100] despite their FOIA and document-

production requests.  Though the plaintiffs argue that, should they gain access to that

information, they might then be in a position to mount a facial challenge to the Act,

as pleaded here, the challenge is focused on the purported unfairness of the plaintiffs'

information deficit in this case.  The plaintiffs' information deficit—if it in fact

---

[99] App. to Opening Br. at A30 (FAC ¶76).

[100] *Id*.

exists[101]—is not a product of the Act or the IPU's regulations. To the contrary, the

IPU Rules provide:

> Each order, decision, and proposed decision of a Presiding Officer shall be available for inspection by the public from the date of entry, unless the order or decision is nonpublic. A nonpublic order or decision shall be available for inspection by any person entitled to inspect it from the date of entry.[102]

If the IPU has not complied with this regulatory obligation—and, notably, the

FAC does not explicitly allege such non-compliance—the plaintiffs or other

aggrieved persons are not without a remedy. For instance, if the plaintiffs could

demonstrate that they have a clear right to the performance of a non-discretionary

duty imposed by law, they might compel the IPU's performance of that duty by

seeking the issuance of a writ of mandamus. But the theoretical availability of a writ

of mandamus does not justify the relief the plaintiffs seek here.

At the risk of redundancy, it bears emphasis that Count II of the FAC—the

count in which the plaintiffs set forth their due-process claim—does not identify any

provision of the Act or the IPU Rules that offends due process. Instead, it is the IPU

Action, defined as the in-house administrative proceeding the IPU commenced in

2020 naming the plaintiffs as respondents, that, according to the FAC, does not meet

---

[101] In its answering brief, the IPU asserts, and in their reply brief the plaintiffs do not contest, that records concerning IPU precedent are amply "available on the IPU website (245), Westlaw (433), and Lexis Nexis (448)." Answering Br. at 33.

[102] 6 Del. Admin. C. § 206.

the Delaware Constitution's due-process requirements. To be sure, the FAC is replete with allegations that the plaintiffs' inability to secure the IPU's prior orders and decisions hampered their ability to challenge the Presiding Officer's impartiality. But the plaintiffs do not identify any aspect of the statutory or regulatory procedure governing IPU actions generally that deprives respondents in all cases of the information that these particular plaintiffs believe is so vital to their defense. This failure defeats the plaintiffs' due-process claim to the extent it can be viewed as a facial challenge.

## V

For the reasons set forth above, we affirm the judgment of the Superior Court.